Brooks & Raub,
A Professional Corporation
David S. Caplan [Cal. Bar No. 74219]
721 Colorado Avenue, Suite 101
Palo Alto, California 94303-3913
Telephone:   (650) 321-1400
Facsimile:    (650) 321-1450
Email: dcaplan@reorglaw.com

Counsel for Debtor,
Accom, Inc.

# UNITED STATES BANKRUPTCY COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re<br><br>Accom, Inc.<br><br>    Debtor.<br><br>Address:  1490 O'Brien Drive<br>       Menlo Park, CA 94025<br><br>Employer Identification<br>Number 94-3055907 | Chapter 11<br><br>Case No. |

## DISCLOSURE STATEMENT FOR

## DEBTOR'S CHAPTER 11 PLAN DATED AUGUST 19, 2005

## TABLE OF CONTENTS

INTRODUCTION .................................................................................................................. 1

SUMMARY ........................................................................................................................... 1

BACKGROUND .................................................................................................................... 3

    Prior Chapter 11 Case and Plan .................................................................................... 3
    Accom's Further Financial Deterioration ..................................................................... 3
    Final Efforts to Recover Value ....................................................................................... 4
    Transactions Reflected in the Plan ................................................................................ 4
    Urgency and Pre-filing Creditor Negotiations ............................................................. 6

DESCRIPTION OF THE PLAN ........................................................................................... 8

    Inscriber Agreements and Transfer of Assets to Newco ............................................. 8
    Anticipated Funds to be Available for Creditors ......................................................... 8
    Description of Claim Categories and Estimated Distributions .................................. 9

        Chapter 11 Administrative Claims .......................................................................... 9
        Priority Governmental Claims .............................................................................. 10
        Priority Employee Claims (Class A) ..................................................................... 10
        CMA Secured Claims (Class B) ............................................................................ 10
        General Unsecured Claims (Class C) .................................................................... 11
        Order of Distributions ............................................................................................ 12

    Post-confirmation Administration; Plan Implementation Expenses ...................... 12
    Executory Contracts and Unexpired Leases ............................................................. 14

        Assumption of Contracts and Cures of Defaults ................................................ 14
        Rejection of Contracts ............................................................................................ 14
        Deadline for Rejection Claims .............................................................................. 15

    Retention by Estate of Debtor's Claims ..................................................................... 15
    Bankruptcy Court Jurisdiction ................................................................................... 16

LIQUIDATION ANALYSIS ............................................................................................... 16

CONCLUSION .................................................................................................................... 17


EXHIBIT A – Historical Financial Statements

EXHIBIT B – Chapter 11 Cash Forecast

EXHIBIT C – Resume of Liquidating Agent

# INTRODUCTION

Accom, Inc., a Delaware corporation ("Accom" or "Debtor") has formulated its **Chapter 11 Plan Dated August 15, 2005** ("Plan") and requests your acceptance of the Plan.[1] This Disclosure Statement contains a summary of the Plan and background information to assist you in deciding whether to accept the Plan.[2]

Financial restrictions have required a reduction in the number of personnel available for accounting functions and have reduced the quality of Accom's accounting records. Also, for the reasons described under "Background" below, this Disclosure Statement was prepared on an expedited basis.

**ACCOM IS UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN IS WITHOUT ERROR, ALTHOUGH ACCOM HAS MADE ALL REASONABLE EFFORTS UNDER THE CIRCUMSTANCES TO BE ACCURATE.**

# SUMMARY

In mid-June 2005, the company determined that it could not expect to have sufficient revenues and cash resources to stem continuing losses and meet its ongoing liabilities. Therefore, except for providing technical support to customers, Accom ceased business operations.

In an effort to generate the maximum funds to repay creditors, Accom personnel tried, and failed, to sell the company. However, they have generated a means to provide some recovery for creditors from its two remaining valuable assets (its intellectual property and its accounts receivable), and those means are embodied in the Plan that Accom asks you to accept.

---

[1] A copy of the Plan accompanies this Disclosure Statement. The terms defined in the "Definitions" section of the New Plan have the same meanings in this Disclosure Statement.

[2] This document is intended to provide you with adequate information, in compliance with §1125(a)(1) and §1126(b)(2) of the U.S. Bankruptcy Code, so that you will be able to make an informed judgment about the New Plan before exercising your right to vote.

In essence, the Plan provides for Accom to enter into two independent sets of transactions, but the successful completion of the first set is contingent on accomplishing the second.

First, Accom will issue a fully-paid license to one of its major customers, the "Inscriber" division of Leitch Technology International, Inc., based in Canada, in exchange for a $350,000 fee. The fee will be distributed among Accom's secured creditors who hold the intellectual property as collateral. Accom will also enter into an agreement to develop, on the customer's behalf, certain upgrades to the licensed technology. Accom's creditors will not receive any of the $150,000 in fees generated under the development agreement; those fees will pay for the engineers who do the development work. However, the customer will not pay the license fee unless it is assured that it has access to the development support.

Second, since Accom has no reason to stay in existence, a newly-formed company ("Newco") will take over Accom's obligations under the license and development agreements and will collect the outstanding receivables. Newco was formed by two of Accom's officers. In exchange for Newco's assumption of these obligations, Accom will transfer all of its assets to Newco other than the $350,000 license fee, one-half of its Cash and Receivables and certain contract rights. Under the Plan, the license fee and the other retained assets will be distributed to creditors, after which Accom's corporate existence will terminate. Accom's shareholders will not receive anything under the Plan.

Accom estimates that approximately $500,000 will be available for creditors, representing a recovery of about 6.5% to 7.0% of outstanding claims. Accom is very disappointed that it was unable to either stay in business or provide a better return, but it believes this is the best alternative available under the circumstances.

2

DISCLOSURE STATEMENT FOR
DEBTOR'S CHAPTER11 PLAN
DATED AUGUST 19, 2005

Case: 05-32680   Doc# 9   Filed: 08/19/05   Entered: 08/19/05 18:13:46   Page 4 of 19

# BACKGROUND

**Prior Chapter 11 Case and Plan**

In 2002, Accom was in financial trouble and restructured its then-outstanding debt in an earlier Chapter 11 case. In 2003, the Bankruptcy Court confirmed an earlier plan of reorganization ("Prior Plan") that contained two terms that are material to understanding the Plan. First, the Prior Plan provided for full payment of the claims it restructured (through regular quarterly payments) and, second, it granted a security interest in substantially all of Accom's assets to Credit Managers Association of California ("CMA") as representative of those prior creditors ("Secured Creditors") to secure the restructured obligations.

**Accom's Further Financial Deterioration**

As you will see from the financial statements attached as Exhibit A to this Disclosure Statement, Accom was losing money for a considerable time. Regardless, it continued paying its operating expenses in the ordinary course and making the quarterly payments to its Secured Creditors since approval of the Prior Plan in January 2003. Accom paid approximately $500,000 in addition to approximately $1,000,000 distributed to those creditors before the prior Chapter 11 case. Nevertheless, Accom still owes, collectively, about $7.0 million, including interest, to the Secured Creditors.

Unfortunately, Accom was unable to stem the tide of losses or continue its business successfully. Business in the years 2003 and 2004 was poor but good enough to continue to pay for the operations, develop new products for the future and pay down some of its secured debt. However, revenue for the first quarter of 2005 was well below expectations. Accom was well received at the annual National Association of Broadcasters tradeshow in April, but the subsequent order rate was not good enough to support continued development and manufacture of products. On June 15th, Accom let

go 41 of its 50 employees and curtailed the company's operations to only providing technical support to customers.

**Final Efforts to Recover Value**

Faced with the downturn for the company, Accom undertook to achieve as much recovery as possible under the circumstances for its creditors. The board of directors considered possible alternatives, including raising more capital and selling the company. Given the current economic situation, raising new money was found not to be practical. Therefore the board authorized attempts to sell the company as quickly as possible.

Accom's representatives approached and met with the senior management of several companies who would have interest in its products and technologies and tried to convince them of the strategic fit. Unfortunately, none of these companies responded with positive interest in buying the whole company, or even certain product lines.

**Transactions Reflected in the Plan**

Although Accom did not find anyone interested in buying the company or any of its product lines, Inscriber has tentatively agreed to buy a nonexclusive technology license for the Accom Sequoia video board. This License Agreement will allow Inscriber to manufacture the board as well as complete development of the board technology. All of Inscriber's products are based on this board, and they are willing to pay $350,000 for the nonexclusive license to the board technology, <u>as long as Accom can complete the transaction in a timely fashion to protect the Inscriber revenue stream</u>.[3]

---

[3] Accom believes that Inscriber may already be investigating alternatives to this license for the Accom product and, therefore, it is critical that the Inscriber transaction be completed as quickly as possible. This is the reason why Accom is pressing to rapidly achieve Confirmation of the Plan so that Inscriber will remain with the Accom technology.

Given Accom's inability to generate any other value from its intellectual property, the only assets with any material value to creditors are the potential license sale and outstanding accounts receivable.[4]

The company's goal, therefore, is to provide as much cash to the creditors as is practical. Accom is endeavoring to accomplish this by (i) completing the license transaction with Inscriber and (ii) collecting the outstanding accounts receivable.

Before Inscriber will complete the license transaction, Accom must sign a Development Agreement and commit to providing the design and engineering expertise to complete the development of the Sequoia board. Inscriber has agreed to pay approximately $150,000 over time under the Development Agreement. However, these funds are expected to barely pay the costs of the personnel to do the work. Unlike the $350,000 License Payment, these funds will not be available for creditors.

In order to preserve the collectibility of Receivables, customers must be assured that they will continue receiving technical support. This is critical to preserving the value of outstanding receivables because customers tend to withhold payments and assert offsets when they lose ongoing support.

Personnel need to be available to continue providing the technical support and do the development work for Inscriber. Theoretically, Accom and its creditors could have arranged the restructuring reflected in the Plan and continued in existence to provide the development work and technical support. However, in addition to its debt, Accom has substantial overhang as a public company with nearly 100 shareholders of record. Keeping Accom in existence for these limited purposes does not appear practical.

---

[4] Some equipment to be transferred to Newco has about $95,000 in theoretical fair market value. However, Newco needs the equipment to provide technical support to customers and do the Inscriber development work, and it is equipment that would be difficult for the estate to sell under current market conditions.

Accordingly, Phil Bennett (Accom's Executive Vice President of Technology) and Junaid Sheikh (its Chief Executive Officer) have agreed to form a new company ("Newco") to perform the customer support, do the development work for Inscriber, and collect outstanding Receivables. Without their willingness to do so, Accom creditors would lose the license fee and the value of Receivables would be far less. [See "Liquidation Analysis" below.] In exchange for their assumption of the foregoing duties, Accom will transfer all its equipment, parts inventory and intellectual property to Newco, and Newco will retain one-half of the collected Receivables.

Without shipping new products, the revenue from customer support activities needed to preserve the value of Receivables (currently about $11,000 per week) will be in constant decline and it will only be a relatively short period of time before it is not a viable business. The $150,000 to be received from Inscriber under the Development Agreement will barely pay the personnel and other costs of performing the work.

Mr. Sheikh has stated that he believes that Newco will be able to support itself for one to two years using the revenue it generates from technical support, the development work, and the 50% of the Receivables. He and Mr. Bennett state that they do not currently have any interest from investors, buyers or customers for any business beyond the support and development. However, they indicate that, for them to have the incentive to undertake the responsibilities described above, they need the flexibility to seek new opportunities without the burdens of other interests being involved. Therefore, Accom's creditors and shareholders will not have any interest in Newco or its future activities.

### Urgency and Pre-filing Creditor Negotiations

As noted above, Accom must be in a position to complete the Inscriber transactions before Inscriber locates or creates a competing technology to the Sequoia board. Accom does not have any information about the status of Inscriber's efforts to

do so and, therefore, has believed that all delay is prejudicial to obtaining the $350,000 from Inscriber.

Accom could have entered into the License Agreement and the Development Agreement without commencing a Chapter 11 case because most of its largest creditors supported Accom's efforts. However, Accom was blocked by the existence of the CMA Security Interest from the Prior Case and the particular terms of the Prior Plan.

Inscriber would not enter into the License Agreement unless it was free of or senior to the lien held by CMA on behalf of the Secured Creditors. Under the Prior Plan, CMA did not have authority to release or subordinate its lien (absent full payment of the $7.0 million owed to those creditors) without the consent of the committee of creditors ("Committee") appointed under the Prior Plan. In addition, the Committee did not have the authority under the Prior Plan to consent to a release or subordination without the agreement of <u>all thirty-five (35)</u> of the Secured Creditors.[5]

Therefore, Accom's representatives, with the Committee's unanimous support, solicited the consent of the Secured Creditors to subordination of the CMA lien to the Inscriber license and those creditors' agreement in principle to the asset transfer to Newco. After a week of canvassing them, Accom received consents from 22 out of the 35 creditors, representing $6.3 million out of the total $7.0 million. Unfortunately, a couple of the smaller Secured Creditors said they would not respond, and Accom received indications that other creditors would never respond.[6] Given the time urgency, Accom determined that the only means to achieve approval for the transactions was to present them to the entire creditor body through the Plan and seek its Confirmation by the Bankruptcy Court.

---

[5] The members of the Committee hold $5.6 million out of the total $7.0 million in Secured Creditor claims.

[6] For example, Accom was informed by counsel for one collection agency that held two of the Secured Creditor claims ($15,000 in total) that the agency was in disarray and the recovery percentage so small that he was sure the agency would not respond.

## DESCRIPTION OF THE PLAN

**THE FOLLOWING SUMMARY AND OTHER SECTIONS OF THIS DISCLOSURE STATEMENT SUMMARIZE AND PARAPHRASE THE TERMS OF THE PLAN. ALL DESCRIPTIONS IN THIS DISCLOSURE STATEMENT ARE QUALIFIED BY THE TERMS OF THE PLAN, AND YOU ARE URGED TO READ IT CAREFULLY.**

**IF THERE ARE ANY INCONSISTENCIES BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT, THE PLAN IS CONTROLLING.**

### Inscriber Agreements and Transfer of Assets to Newco

To implement the transactions with Inscriber and Newco, the Plan contains the following terms:[7]

1. Confirmation of the Plan will mean approval of the License Agreement and the Development Agreement with Inscriber and the Sale Agreement with Newco by the Bankruptcy Court and authority for Accom to implement them.

2. Accom will transfer all of it equipment, inventory, and most other assets and intellectual property to Newco, subject to Inscriber's rights under the License Agreement. The assets will be transferred to Newco free and clear of all liens, claims and interests of Accom creditors, except for the retention by the estate of the $350,000 License Payment, one-half of certain Cash and one-half of the Receivables and certain contract rights. [See item 6 below.]

3. The $350,000 License Payment will be distributed to the Secured Creditors.

4. The License Agreement and the Development Agreement (except for the License Payment) will be assigned to, and assumed by, Newco, and Accom will not have any more rights or obligations under them.

5. Newco will collect Receivables, and it will provide technical support to customers at least as long as doing so will enhance the collectibility of outstanding Receivables.

6. As the Receivables are collected, Accom's creditors and Newco will split the proceeds 50/50. Accom's creditors and Newco will also evenly split the Cash remaining on hand (after paying certain expenses) on the Effective Date of these transactions under the Plan.

### Anticipated Funds to be Available for Creditors

Based on its current projections of receipts and disbursements during the course of the Chapter 11 Case, Accom estimates that approximately $540,000 will be available

---

[7] See Article V of the Plan: "Means for Implementation of the Plan."

for distribution to creditors and payment of expenses of implementation of the Plan and winding up of Accom's affairs, derived from the following sources:

1. The $350,000 License Payment to be distributed to the Secured Creditors promptly after the Effective Date;

2. Approximately $130,000 as the creditors' share of Accom's cash on hand on the Effective Date;[8] and

3. Up to another $60,000, representing the creditors' share of Receivables outstanding on the Effective Date.[9]

**Description of Claim Categories and Estimated Distributions**

The Plan contains three classes of claims (see Article II of the Plan) and two categories of claims that are not called "classes" under the Bankruptcy Code (see Article III of the Plan). Following is a description of each category and an explanation of the Distributions each category is expected to receive, based on the anticipated $540,000 that will be available for distribution:

**Chapter 11 Administrative Claims**

As required by the Bankruptcy Code, all Allowed Claims that arise during the Chapter 11 Case (administrative claims) must be paid in full on the Effective Date of the Plan. [See §III.A. of the Plan.] Accom has been paying its normal operating expenses as they come due, so it anticipates that the only claims payable on the Effective Date will be for expenses where Accom does not receive a billing before the Effective Date. Accom expects these expenses to total approximately $5,000.

> **NOTE:** The Plan contains a deadline for requesting payment of these administrative claims. Claims not asserted by that deadline will not be allowed or paid. [See §III.B. of the Plan.]

---

[8] See Exhibit B hereto.
[9] Refunds of insurance premiums and other deposits may also generate approximately $100,000 of other funds for creditors when those policies are cancelled after confirmation.

9  DISCLOSURE STATEMENT FOR
DEBTOR'S CHAPTER11 PLAN
DATED AUGUST 19, 2005

Case: 05-32680   Doc# 9   Filed: 08/19/05   Entered: 08/19/05 18:13:46   Page 11 of 19

**Priority Governmental Claims**

This category includes pre-Filing Date claims by government agencies that are entitled to priority under the Bankruptcy Code. They are to be paid in full on the Effective Date. [See §III.C. of the Plan.] To the best of Accom's knowledge, only sales and use taxes would be in this category.[10] Accom expects all its prepetition taxes to be paid, however, before the Effective Date; however, there might be as much as $9,000 in sales tax claims to be payable on the Effective Date.

**Priority Employee Claims (Class A)**

This class includes claims by employees and employee benefit providers entitled to priority under the Bankruptcy Code. [See §II.A. of the Plan.] Accom believes that the only claims in this class will be those of the nine employees remaining with the company for vacation accrued in the 90 days before the Filing Date, for a total of about $8,900. The Plan requires them to be paid in full on the Effective Date. [See §IV.B. of the Plan.]

**CMA Secured Claims (Class B)**

This class includes the secured portion of the claims held by the 35 Secured Creditors treated under the Prior Plan. [See §II.B. of the Plan and "Urgency and Pre-filing Negotiations" above.] Since these claims were allowed under the Bankruptcy Code and the Prior Plan, their original principal amount was conclusively determined in the Prior Case. The remaining unpaid portion of that amount, including accrued interest, is $7,012,139 in the aggregate.

However, under the Bankruptcy Code, claims are considered secured only up to the value of the collateral securing those claims. The collateral in this case is all assets of

---

[10] On August 17, 2005, Accom received a telephonic inquiry from the San Mateo County Tax Collector stating that it desires to audit the Accom property tax returns for the 2002 through 2005 tax years. Prior audits have not resulted in any additional liability for these taxes and, in light of the substantially deteriorated value of its personal property, Accom does not anticipate any liability from this audit if it proceeds. However, if the assessor insists on conducting the audit, Plan Expenses may have to be incurred for personnel to respond to the audit inquiry.

Accom other than deposits pledged to third party creditors that are less than the claims of the creditors holding those deposits. Accom estimates that the assets covered by the CMA Security Interest have a value of $500,000. This would be the aggregate amount of secured claims in Class B but, after discussions with the Committee representing the Class B creditors, Accom believes that at least $50,000 of that value should be contributed to holders of general unsecured claims (Class C) to assure that there is some distribution to creditors not among the Secured Creditors group. Accordingly, the Plan provides that the aggregate amount of the secured claims in Class B is $450,000, and the Plan provides for the Secured Creditors to receive up to this amount on account of their Allowed Claims in Class B in the manner described below under "Order of Distributions."

**General Unsecured Claims (Class C)**

Class C consists of all unsecured claims not included in another category. [See §II.C. of the Plan.] Generally, this class includes (a) the portions of the claims of the Secured Creditors that exceeds their $450,000 secured portions (approximately $6,562,000, (b) any claims filed on account of rejection of executory contracts, and (c) any general trade claims that arose before the Filing Date but were not paid. The Debtor expects the contract rejection claims to be mostly from the two landlords (Menlo Park headquarters and Grass Valley accounting office), totaling about $119,000 net of security deposits.[11] Accrued expenses are expected to be minimal, but an estimated aggregate of $3,130 is used for projecting cash distributions to creditors in this Disclosure Statement.[12] Therefore, Accom estimates that Allowed Claims in Class C will total approximately $6,684,130.

---

[11] See "Executory Contracts" below and Article VIII of the Plan.
[12] On August 17, 2005, Accom received a letter from counsel for an insurance company stating that a fire occurred at the facility of one of its insureds and putting Accom on notice that they are investigating whether an Accom product contributed to the fire. Accom is tendering the potential claim to its insurance carrier.

11    DISCLOSURE STATEMENT FOR
DEBTOR'S CHAPTER11 PLAN
DATED AUGUST 19, 2005

Case: 05-32680    Doc# 9    Filed: 08/19/05    Entered: 08/19/05 18:13:46    Page 13 of 19

Accom anticipates that only approximately $67,000 will be distributable to holders of Class C claims. Those Distributions will be made as described under "Order of Distributions" below.

**Order of Distributions**

The Plan provides for Distributions on Allowed Claims to be made in the following order of priority [see §§V.D. & E. of Plan]:

| Category | Est. Distribution |
|---|---|
| Chapter 11 Administrative Claims | $ 5,000 |
|     Payable in full by Debtor on Effective Date | |
| Priority Government Claims | 9,000 |
|     Payable in full by Debtor on Effective Date | |
| Priority Employee Claims (Class A) | 8,900 |
|     Payable in full by Debtor on Effective Date | |
| Class B Secured Claims | 350,000 |
|     Payable from License Payment | |
| Class C Unsecured Claims | 50,000 |
|     Payable as soon as funds available | |
| Class B Secured Claims | 100,000 |
|     Payable as soon as funds available | |
| Class C Unsecured Claims | 17,100 |
|     Payable when funds available, if any | |
| Total Anticipated Distributions | $540,000 |

**Except for the License Payment, the amounts set forth herein are estimates based on Accom's projections of receipts and expenditures during and after the Chapter 11 Case. Accom makes no warranty that actual results will match the projections in this Disclosure Statement.**

**Post-confirmation Administration; Plan Implementation Expenses**

After Confirmation, Accom will no longer have business operations, but its corporate existence will continue for purposes of receiving and reviewing claims, making Distributions, and meeting the corporation's and the estate's administrative obligations. The principal obligations will be to review claims, file certain reports with the Bankruptcy Court, file any final tax returns and reports, and complete, if necessary, the corporate dissolution process under Delaware law.

Accom has already paid $11,500 to its regular tax accounting firm to prepare its final federal income tax return and returns in the 14 states where it has done business for the fiscal year ending September 30, 2005. Newco will have possession of Accom's business records and is required by the Plan to assist the accountant in completing those returns and any outstanding state sales tax returns.

The Plan appoints a third party, Mr. Earl Aiken, to serve as Liquidating Agent to collect the funds from Inscriber and Newco, maintain them in a Claims Reserve, review creditor claims and make the Distributions to creditors provided for under the Plan. He will be entitled to compensation for his services at the rate of $175 per hour. A copy of Mr. Aiken's resume is attached hereto as <u>Exhibit C</u>.

The Plan also provides for the Committee to continue after Confirmation, but its role will be limited. The Committee will receive notice of important events and have the right, but not the obligation, to oppose proposed actions by the Liquidating Agent, object to claims, and bring actions to recover property (such as avoidable preferences) if no other party does so and the Committee, in its sole discretion, so elects.

Both the Committee and the Debtor will have the right to employ professionals to assist them in their duties, but Accom does not anticipate that they will require much professional assistance. Also, Accom's counsel, Brooks & Raub, will continue to represent it after Confirmation, and Brooks & Raub should still hold funds on deposit from its pre-Filing Date retainer.

The Plan implements a principle whereby the burden of priority claims and Plan Expenses will be borne equally by creditors and Newco. Therefore, amounts payable on priority claims (administrative, governmental and Class A employee claims) are to be paid or reserved for prior to splitting the remaining Cash between the estate and Newco. [See §V.E. of the Plan.] Also, Newco is required to reimburse the estate for

one-half of certain post-Confirmation Plan Expenses up to a limit of $2,500. [See §V.K.3 of the Plan.]

### Executory Contracts and Unexpired Leases

#### Assumption of Contracts and Cures of Defaults

The Plan provides that Accom will assume the prepetition executory contracts listed on Exhibit A to the Plan. The contract listed in Exhibit A-2 to the Plan will concurrently be assigned to Newco, after which Newco, not Accom, will have all of the rights and obligations under those contracts.

Accom is required to cure all outstanding defaults in a pre-petition executory contract as a condition to the right to assume and/or assign the contract. As of the date of this Disclosure Statement, Accom does not believe there are any defaults to be cured, as stated on Exhibit A to the Plan.

The Plan provides that the nondebtor parties to the contracts listed on Exhibit A will be bound by the statement on Exhibit A that there are not any defaults and cannot later assert a claim for a pre-Effective Date default.

> **If you are the nondebtor party to a contract listed in Exhibit A to the Plan and believe that a cure amount is due, you will have to file an objection to Confirmation of the Plan asserting that you claim a different cure amount or you will be bound by the amount stated in the Plan.**
>
> **[See the Notice of Hearing on Confirmation of Plan, etc., accompanying this Disclosure Statement for an explanation of the deadline for filing objections to Confirmation.]**

#### Rejection of Contracts

The Plan further provides that all other executory contracts will be rejected by virtue of Confirmation. Parties to contracts or leases rejected under this provision may become entitled to file claims in this Chapter 11 Case, which could result in additional debts for unfulfilled obligations under such contracts and leases. Those debts will be included in Class C under the Plan.

### Deadline for Rejection Claims

Any party who asserts a claim for damages arising from an executory contract rejected under the Plan must file a "Proof of Claim" with the Bankruptcy Court, and serve copies thereof on the Debtor, the U.S. Trustee, and the Committee, not later than (1) sixty (60) days after the date of mailing of notice of entry of the Confirmation Order or (2) the Bar Date (general deadline for filing proofs of claim – see §I.A.8 of the Plan), whichever is later.

**Any party who does not timely file and serve such a Proof of Claim shall be forever barred from asserting its rejection claim and shall not be entitled to any payment from the estate or the Debtor.**

### Retention by Estate of Debtor's Claims

The Plan provides for the Debtor to retain and enforce any Avoidance Claims against third parties held by it or its estate that arise from the power, under the Bankruptcy Code or otherwise, to avoid and recover transfers, except such claims that have been waived, transferred, or released under the Plan. The Committee will have concurrent power and authority, but not the obligation, to prosecute and recover any Avoidance Claims. All proceeds from recovery on such claims shall be deposited into the Claims Reserve and distributed in accordance with the Plan.

The Debtor does not believe, based on its preliminary review, that it will have any Avoidance Claims. The Liquidating Agent will investigate the expenditures and payments prior to commencement of the case and both he and the Committee expressly reserve their rights to pursue recoveries by litigation or other judicial or quasi-judicial methods after Confirmation of the Plan should further investigation warrant such action.

**Bankruptcy Court Jurisdiction**

Among other provisions, the Plan also provides for continued exclusive jurisdiction by the Bankruptcy Court, and any controversies and disputes which arise under the Plan must be resolved by the Bankruptcy Court.

## LIQUIDATION ANALYSIS

Based on the estimated values of assets and amounts of debts discussed elsewhere in this Disclosure Statement, Accom estimates that the Secured Creditors will receive Distributions totaling approximately 6.5% to 7.0% of their claims if the Plan is confirmed, and that holders of Class C claims other than Secured Creditors with claims in that class would receive approximately 1.7% of their claims.

If the Plan is not confirmed and, therefore, the Inscriber agreements and the sale are not accomplished, Accom estimates that the Secured Creditors would not receive the $350,000 from Inscriber and the outstanding Receivables would lose substantially all of their value. Accordingly, if this case were converted on the Effective Date to a Chapter 7 liquidation case, Accom estimates that the Secured Creditors would only receive approximately $275,000 in Cash available on September 30 after the estimated payment of administrative, employee and tax claims to which the CMA Security Interest is subordinate, and Class C creditors would receive nothing.

For this reason alone, in addition to other potential reasons, Accom believes such holders will receive more under the Plan than they would receive if this case were converted to one under Chapter 7 of the Code on the Effective Date and Accom's assets were immediately liquidated.

///

///

///

///

## CONCLUSION

The foregoing Disclosure Statement contains only a summary of the Plan. If confirmed, the Plan will be legally binding on all creditors, shareholders and other interested parties. An understanding of its provisions is, therefore, important. You are urged to read the Plan in full. You are further urged to discuss any questions you may have with your counsel.

Dated: August 19, 2005

ACCOM, INC.

By:    /s/ Phillip Bennett
             Executive Vice President

Brooks & Raub,
A Professional Corporation,
Counsel for Debtor, Accom, Inc.

By:   /s/ David S. Caplan